The next case on today's docket is the case of Terry Martin, Fedol v. Keeley & Sons, an Egyptian Concrete Company et al. We have Anthony Delbert as far as he's an appellant. And we have Kenneth Westfalmer for the appellant who will not argue. And we have Russell Scott for the athlete, I believe, who will argue. We have a couple others who won't argue. Debbie Champion. Debbie Champion. I don't see that. Oh, on the page. Both on the same line. And you've divided your time and are prepared to each argue ten minutes. So, you may proceed. Thank you, Your Honor. May it please the Court. My name is Anthony Delbert. I'm with the Law Firm of Crowder & Skaggs. We represent the appellants, the plaintiffs in this case, Terry Martin, Ricky Vano, and Ardith Wynn. This case arises out of a failure of a bridge beam in Randolph County on May 29, 2001. My client suffered some significant injuries. Mr. Martin suffered or has had fusions of two cervical and two lumbar vertebrae. Excuse me, fusion of the vertebrae, removal of the disc. Mr. Vano has had three cervical and three lumbar vertebrae fused, and he has a thoracic herniated disc that has not been repaired yet due to the intensive nature of the surgery. And Mr. Wynn suffered a significant shoulder injury that has significantly limited his ability to work. Mr. Martin is a young man who is permanently and fully disabled with a wife and three children at home. Mr. Vano also has not returned to work since the accident in 2001. This is a case regarding, this is an appeal from a finding in the circuit court that did that. Keely & Sons had no duty to preserve the concrete I-beam that failed in 2001. The I-beam failed on 830 the following morning. Mr. Martin and Keely destroyed the I-beam after having an opportunity to conduct its own inspection of the beam, draw a conclusion as to what the nature of the failure was, and also to allow OSHA, the Occupational Safety and Health Administration, and the Illinois Department of Transportation to conduct investigations of the site and the failed beam. Am I correct that OSHA didn't tell them to destroy it, but just to remove it? That's exactly right. And whether it was OSHA or IGOT, they said, well, whomever it was, that's not really the issue. The issue is that even assuming for the sake of argument they were told to remove it, that hasn't, I think, been conclusively established by anything other than Mr. Keely's testimony. Even assuming that is the case, they weren't told to destroy the beam. And Mr. Keely testified in his deposition that they had means and methods by which to remove the beam from the creek to address I-beam. You're not suggesting there's any intent? Not at all, Your Honor. No, no, no. I think this is a, I mean, there's nothing in the record to indicate this was intentional, but there is enough evidence in the record to indicate it was negligent. And there were means by which, and this kind of goes to that point, Your Honor, there were means by which Keely could have removed that beam or at least preserved the broken portion of the beam. Did an Egyptian concrete inspect this beam prior to the accident? I believe as part of the fabrication process there was testing done of the beam. And why wouldn't that be enough to satisfy? Well, I mean, we don't know maybe what conditions it was transported under. We don't know what conditions, I mean, we don't know at all. That's the problem is it's hard for me to say, Your Honor, because nobody's had a chance to inspect the beams. And there might have been, I don't know, maybe the conditions that day were not appropriate for the placement of the beam. Maybe in transport the beam suffered some sort of, what's the word, not failure, but it was compromised in some way, shape, or form. Without having the beam, honestly, I can't stand here and tell you, Your Honor. So the inspection that Egyptian concrete did prior to the installation or delivery of the beam wouldn't be relevant at all in your case? From the spoliation perspective, Your Honor? No, in your lawsuit. In the case of Chief against Egyptian? I think it's probably relevant, whether it's determinative of that the beam was adequately prepared, that the beam was transported properly, or that the beam was fit for its intended purpose. I think it's relevant. I don't think it's inclusive, and I'm sure the Egyptian concrete would make that argument. Hey, we tested this beam, and it tested out just fine before we got it there. But without having the beam, we can't know why this beam or how this beam failed. Maybe the tendons were bad. Maybe the pre-stressed tendons that are put in this beam were bad. I don't know. And I don't think anybody can know, and that's why we're here. Because they have, Keeley, through its negligent actions, has compromised plaintiff's ability to prove its case against the manufacturer of the beam and, frankly, has compromised the manufacturer's ability to say it wasn't our fault. This beam was just fine, and we tested it before we got there. How would it compromise their position if they already did their testing on it? Aren't they going to be able to show that in your product's case against them or your account against them? Certainly, but there's evidence in the record of other tests, ultrasonic testing that could be done, visual inspections of the beam post-failure that might reveal defects in the beam that could be done, that Egyptians probably would like to have or should have been able to do in order to shore up his argument that, hey, we tested this beforehand. The test, and I'm not an expert, but the test, as I understand it, was a test of the strength of the concrete, and it passed this test. You're saying more sophisticated tests could have been done. Exactly. That's exactly it. And different tests probably could have been done to see that, okay, the test we did proved, you know, it was what we were supposed to do beforehand, and that showed what was supposed to show beforehand, but now that we see what failed and we see how it failed, we're going to do different tests to maybe draw a different conclusion as to what else could have been done or to say, no, we really did do everything we were supposed to do. I mean, it's kind of a two-way street from Egyptian and the plaintiff's perspective. On the one hand, the plaintiff needs to know so that they can prove their argument. Does the record show what type of additional tests would be necessary? Yeah, like I said, Your Honor, there's deposition testimony that reflects that ultrasonic testing could, and Egyptian even mentions it in the brief, the types of testing that could have been done. Ultrasonic testing, visual inspection of the beam. I mean, you could even – those are the two that, frankly, come to my mind right now, Your Honor, but Egyptian has addressed those issues in the brief and have mentioned what could be done. And that's why the spoilation of this evidence is so critical in this particular case. And we know that under Boyd v. Travelers, which is the watershed pronouncement of the tort and negligent spoliation in this state, that there has to be some special circumstance for voluntary undertaking as the first step in the duty analysis. And then once we get over that, once plaintiffs get over that hump, and in this case third-party plaintiffs get over that hump, then we move to the foreseeability analysis. Frankly, the circuit court never got to the foreseeability analysis. Could you define special circumstance for me, that phrase? Well, that's why we're here. And give me an example. I think that's why we're here. And the example I would give you is this case. It is the facts of this case where we have a failure of a beam, we have several severely injured individuals, and we have the beam destroyed the morning after the collapse, while at least one of those persons is still in the hospital. Dardeen v. Keeling alludes to the types, I believe, of special circumstances that will give rise or will satisfy this relationship test. And Dardeen says, in that case, the insurer told its insurer, you can fix your sidewalk if you want to. The plaintiff fallen off the sidewalk. The insurer fixed the sidewalk. Now, what's interesting is that the plaintiff also filed a spoliation case against the insurer, and that case was settled. That case wasn't appealed. There was no issue in that case over whether or not the insurer was liable for spoliation of evidence. That's exactly what we have. We have the actual spoliator of evidence before the court, not the insurer, not a person once removed. We have the actual entity that destroyed the evidence before the court. Well, what's the special circumstance? The special circumstance is the argument is threefold, and the first one kind of combines possession. It's possession and control, which I believe sort of goes hand in glove with a voluntary undertaking. Well, all spoliations have possession and control. Not necessarily, Your Honor. For example, the Jones v. O'Brien tire and battery case, that country mutual in that case, the insurer did not have possession or I think that was wrongly decided, but I mean Well, I understand that's your position, Your Honor. I understand that you and my colleague have a disagreement over that case. But I will say this, Your Honor. Your concerns that you raised in your dissent in Jones, and this is Jones 2, this is when it came back to this district after the Supreme Court remanded it, aren't present here. We're not saying that, we're not asking this court to say that the insurer who said, yes, preserve that evidence is then Against the whole world. Pardon me? Against the whole world. Well, I do think that the duty once established extends to all potential litigants and the Anderson v. Mack truck case stands for that proposition. The Jones v. Jones 2 stands for that proposition. But, setting that aside for the moment, we, the courts, let me kind of get back to Dardenne, because I think that's where this starts. Dardenne says, we, the Supreme Court said, we are not deciding that every case, in every negligent spoliation case, the spoliator must possess the evidence. Now, the way I read that, and I think the most reasonable reading of that is to say that, however, if they do, that will at least get you past summary judgment. And the court says that. The court says that the mere opportunity to control the evidence is not sufficient. There has to be something more. Well, when you combine the court's statement that we don't require possession in every case, but you have to have something more than an opportunity to control, I think that gets you to the conclusion that if you possess and or control the evidence, and then that gives rise to the special circumstances. Now, we still have to engage the foreseeability analysis. So it's not an automatic, you know, it's not an automatic win for Plano. But that's enough to get you to the foreseeability statement, this foreseeability analysis. And I think, again, Jones is in line. Jones, too, is in line with that decision because Jones said, listen, you guys did enough. Contramusually, you did enough to exercise sufficient control under Dardenne, under the Dardenne analysis, to allow the first, to satisfy the first prong of the duty analysis. You've done enough. And even if you didn't, it was still a voluntary undertaking. And I mean, that's part of my argument, too, is once Keeley inspected this beam for their own purposes, to determine the cause of the failure, kept it in its position, admitted that it wasn't a long period of time, but I don't think that cuts in favor of Keeley. I think that cuts against Keeley's position. It was for a short period of time. They got done what they wanted to get done, allowing OSHA to inspect, allowing IDOT to inspect. That duty has arisen. And at least the special circumstances are there because it's either a special circumstance of possession and sufficient control under Dardenne. It's either that, it's a voluntary undertaking, or it's both. But it's not an item. We can't say that, well, yeah, you took some actions with regard to this evidence, and you inspected it, and you figured out what you felt was wrong with it, but that's neither a special circumstance nor a voluntary undertaking. It can be one or the other or both, but I don't think it can be neither. Let me ask you a question. Is it correct that one of Keeley's employees used the word failed? Correct. That's the word that he used. Is that correct? That's my recollection of the deposition testimony. That's what he said. And then Keeley himself said it wrong. Mr. Keeley's position is based on his employee engineers and his inspection of the beam. Was the trial court aware of this disparity of what one employee says and what the other employee says or the owner says? I think the trial court had that in front of them. Certainly on the motion to reconsider. Let me ask another thing. Did the trial court also use the words there is no special circumstance here that would justify the preservation of evidence? Yeah, the trial court's order is – You used the word incredulous. Yeah, and that's frankly, Your Honor, I haven't spoken directly with Judge O'Malley about that, and unfortunately I don't think I'll have the opportunity anymore because he's retired. Well, maybe I can. You can speak your mind. Yeah, that's right. Maybe I can talk to him about it now, Judge. Yeah, and that was curious to me, Your Honor. I mean, I don't know what it means, to be quite honest. But my understanding of the court's order is that none of the – essentially the preconditions to the imposition of the duty exist in this case. That's my understanding of what the trial court said. And like I said, I think we've got a special circumstance here, and this is the possession of control. And really, again, this is just a reasonable extension of Dargene. Not even an extension. I think it's a clarification of Dargene, where they say you've got to have something more. Well, if a decision of how to dispose of this being, along with an inspection of the being by your own employee, together with two regulatory agencies, is not something more, I really don't know what it might be. Aside from a specific request and honoring that request, which is sort of what the defendant argues here, that in order for the special circumstance, any special circumstance to arise, there has to be a request to preserve the evidence. Then the person in possession, presumably in possession of the evidence, then has to take action on that request. And then if that's the case, then we engage in the foreseeability analysis. And I don't think that that's what the Boyd court, their Dargene court, this court in Jones, this court in Stennis v. Kerr-McGee, I don't think that's what the courts have intended when they have set up this court the way that they have. If that were the case, that would be really easy to describe. Frankly, that would be easy to write. This is what you have to do in order to state your claim. These are the elements of your claim. Are special circumstances arise when there's notice that this is going to be evidence? Well, and I think, Your Honor, that if that were the case, that would sort of merge the two almost. You know, you'd get close to merging the two prongs then, which Dargene said we can't do. And frankly, Your Honor, that's where sort of the rub lies with this particular duty analysis. It's hard to say that it's hard to entirely divorce the foreseeability analysis from the special circumstance analysis. But I think we can do that in this case. I have two other arguments that I may agree as to what constitutes a special circumstance. First, an employer-employee relationship. I think the biggest concern with, you know, admittedly, no court has decided that. I'm not going to represent to the court who has decided that. But I think the biggest concern there would be the concern about automatic liability on an employer if they ever get rid of it. Well, I don't think that's the case. I mean, it's a two-step analysis. You know, so just because you have an employer-employee relationship, you still have to engage in the foreseeability analysis. And then you've still got to – there has to be some sort of third-party action to even start with. So if there's a run of the mill, a twist of an ankle, whatever it might be, you know, a torn rotator cuff work, chances are you're not going to have a third-party liability case. So you're not even going to get to the point where the evidence is really material to a potential civil action. But I think that that is a circumstance when you have – and again, it kind of ties into the possession and control analysis. When you have an entity, the employer, who's in exclusive possession and control of the instrumentalities of someone's work, I think it's reasonable to say, hey, you know, you've got a special relationship here, and if you reasonably foresee that any evidence is going to be material to future litigation, you have a duty to preserve that. I think that's reasonable. The employer-employee relationship gives rise to a lot of special rules under the law. There's responding as superior or as one of them. So it wouldn't be the first time that a court has said, employer, employee, you guys are in a special relationship with one another and you have certain obligations towards one another. The other is Keeley's status as a potential litigant. The defendant is absolutely correct in their brief where they say that the Dardeen Court distinguished Cheminosky v. General Motors, which is the case on the duty of a – well, it's a case, but an important case on the duty of a potential litigant to preserve evidence. That being said, the policy statement of the court, I think, is extremely important. In that case, the court said that the reason underlying the duty of a potential litigant to preserve evidence is that an entity cannot avoid liability by destroying evidence prior to the filing of a lawsuit. And I think that policy has to apply, even if it's not mandatory authority in spoliation cases, it's at least instructive in spoliation cases. Because we're talking about the same issue. We're talking about the destruction of evidence that either avoids liability or prevents one from being able to prove liability. And in this case, admittedly, we're dealing with an employer. So their liability is related to the compact and their contribution liability is limited to the amount of their lien under Section 9B of the compact. But for every dollar that the employer is found to be liable, that's a dollar they're not going to get back out of the complaint if the complaint is successful. Their co-defendants are going to get set off. So they're not going to be able to recover that money. They're going to pay in terms of a dollar that an Egyptian or Alan Anderson or whomever else is found to be liable in this case. So we are dealing with liability. And even if we have to kind of – I think this is a case where we sort of have to look beyond the pale of the particular case before the court. That's going to set a precedent where non-employers, foliagers, are essentially given a perverse incentive to get rid of whatever they can as quickly as they can so that they avoid liability. And I think that even if the Shimonofsky case isn't mandatory on this court, it at least instructs the courts in terms of the policy of preservation of evidence in the state of Illinois. I've addressed the – I think I've already addressed in the course of this conversation the arguments, the two big issues out of defendant's brief that I wanted to address, which was the mandatory or the necessity of a request to preserve the evidence and action on that request, and then the timeline of events, how quickly this beam was destroyed. But I think we've kind of – I think we've hit the issues on the head here. I mean, we've got – the big one is possession and control by Keeley and Sons in this particular case. And the other is that I think that ties into a voluntary undertaking. And definitely – may I finish my thought? Yes, you may. We've definitely got enough to get over the threshold set by the Dardeen Court that you have to show something more than an opportunity to control the evidence in order to meet the special circumstances of fraud and theft. Thank you. Thank you very much. Champion? Thank you, Your Honor. May it please the Court? My name is Debbie Champion, and I am here today along with Russell Scott for Keeley and Sons Incorporated. We respectfully request this Court to affirm the ruling of Judge O'Malley in that the clear rule of law in Illinois is that a party generally does not have a duty under the law to preserve evidence. And there are few and narrow exceptions to that rule. And that's what we're here to talk about today. But those few and narrow exceptions that are carved out from that rule of law are carved out very narrowly. None of them apply to the circumstances in this case. You know that there are – under Boyd, there's two parts of the analysis in that the Court in this case found that there is no duty. And there are five narrow exceptions that might impose duty on a party. The Court knows that there are three of those that we all agree on that issue here. Agreement between the parties to preserve evidence. Not here. Nobody's arguing that. Contract. Again, not here. Nobody's arguing that. Statute. Statute that would somehow impose a duty to preserve evidence. Not in this case. The other two things are the things that Russell, Mr. Scott, and I would like to address today, and that's that a special circumstances exists or doesn't exist in this case to impose a duty on the employer to preserve this evidence, or do we fall into the fifth circumstance, which is that there was a voluntary assumption of the duty to preserve by Keeley. Now, the Court asked what is a special circumstance. And I think that's kind of a catch-all. Did Keeley have any opportunity to talk to any of the injured employees  Your Honor, I don't know about opportunity, but I know they didn't. Could they have gone, maybe, but they didn't know. They didn't have any claim or anyone telling them other than a man named Scott knew that he thought something was wrong with me. And what Scott just said is when he called Keeley, he was the guy in charge of that. He called Keeley and he said, oh, man, the bridge fell. The beam fell. The beam's broken and it's in the creek below. And so, of course, everybody fell through. Scott was a construction worker. He did not give any sort of expert opinion as to what was wrong with this. And Keeley had no idea at the time that this was anything more than a workers' compensation claim. He knew that. He knew he was going to be responsible for these three men and their injuries. But he didn't have any notion that something was wrong with the beam. He had, you know, the argument in this case is, well, he took a duty to preserve it. He didn't take a duty to preserve it. He left it where it left. You don't dispute that he wasn't told to destroy it. He was told to get it out of the water. That's right. He was told to get it out of here because it's going to scour the bridge, which means move the dirt away from under the bridge and cause the bridge to have a lack of support. So if they said get it out of here, what he did was cut it up. Yes, no, I agree with that. In this case, though, he had no, there's nothing in the evidence at all that shows that he had any reason to believe that this was a dangerous or this was a defective instrumentality. Unlike Bowbray, the Bowbray case, the Enterprise car. They knew the plaintiff in that case was claiming something was wrong with the car. They inspected it, said nothing's wrong with this car, and destroyed it or got rid of it. In this case, no allegation to Mr. Keeley or any of the employees that there was a problem with the I-beam. IDOT had previously approved the I-beam. Egyptian had previously inspected it and approved the I-beam. They called Egyptian after this. Egyptian said just cut off the ends and send us the inspect. They didn't come out and inspect. OSHA, he had to leave it where it lay. OSHA inspected it and said, no, no, this flipped, this turned. They called Egyptian prior to cutting up the product there. They did, Your Honor. And Egyptian then responded, no, just save us certain pieces of it there. And who did they speak to at Egyptian? I don't have that in my record. Somebody, obviously, an authority is your position? Yes, and it is in the record. I just can't pull the name up. One other thing. Let me get back. You were almost going to define special circumstance for me or give me an example. I was going to give you an example. Give it to me. I think the example that I've seen in the law is the insured insurer circumstance, where I may be an insurer, but if my insurance company, who is not going to be part of this case, the insurance company is not going to be sued, they may be liable, but they're not going to be sued. If that insurer has control over something that I, as an insurer, as a party to a litigation, would have the obligation to preserve, they have that obligation, too. And I think that's what we see in the kind of inverse of that, actually, of what we see in the Jones case, where the insurer and the insurer both have the duty because they know and they tried to take on the obligation to preserve that evidence. Told their insurer to, and the court said in that case, because of the special relationship between the insured defendant and the insurer, we impute this to both of them. I think that's the kind of special circumstance that the court managed. In this day and age when, I don't know how many plaintiffs were injured? Three. Three. According to opposing counsel, very serious injuries there. In this day and age, would not the employer think that litigation is going to arise and they're going to be at least third-partied in on future litigation? Can't we almost assume that? Well, we probably can if we assume that, Your Honor. That there's going to be litigation, and I'm going to probably be a party as the employer, even though workers' comp would exclude me from it, but I'm probably going to be involved in some litigation here. If we assume that, Mr. Kewitt did say, they asked that question, and the record, Mr. Kewitt said, we knew that we were likely to have a plaintiff in this case. We knew we were going to have a comp. And then they went on to say. . . How would a third party be brought in? Would he also not know that this would be a products case? Well, I think that's the problem here. I don't think he did know that. How would he sue anybody else? How would the plaintiff sue anybody knowing that they cannot sue their employer unless it is a products case? And if that's, in fact, what normally would happen, then wouldn't you think common sense would say preserve the product? Here's my response to that, Your Honor. I think in this particular case, Mr. Kewitt thought it was more likely that I got the decision, that they would go after the people who were in charge of the entire project. And that's what he had anticipated. And one of the reasons I think he put I got the notice, I don't believe there's anything in the record that indicates that there's anything that would lead us to believe that he would have ever assumed that they thought something was wrong with this particular item. It had been inspected. As far as he knew, it was fine. OSHA told him it was fine. I got told it was fine. His own engineer said there was nothing wrong with this. It just rolled. And the reason that it rolled was we had too many men on the project at the same time. So that didn't cross his mind. However, in the big scheme of things, I see your point. An employer who has a machine that malfunctions or something happens, you're going to assume a products liability case in the future. But depending on what that product is and depending on whether that employer knows that there is likely something wrong with that product, there's a weighing decision there. The employer has to make the decision, do I carry on with my business or do I stop everything and take this out of service and not service this or take the risk of other people in the future getting hurt on this if we continue to use it without modifying it. That's the reason I think, Your Honor, that two things in Illinois have occurred. Number one, the employment relationship has never been determined to be a special circumstance to impose on the employer the obligation, a special obligation to preserve evidence. And number two, the rule of law in Illinois is that you don't have a duty. That's one reason. You don't have a duty to preserve that evidence, just like in the Dardeen case, because it's an Illinois public policy that we want people to repair problems. We want them to repair problems. We want them to be able to continue the commerce of carrying out their business and repair that machine so people don't continue to be around a dangerous condition. And so in this case, while, yeah, we can all look at this and say, he should have known, the bottom line is there's no evidence that he did or even that he should have or could have at the time this was destroyed. And so I think there is no evidence of a special relationship just because of the employment relationship. Is there any evidence that if an I-beam rolls rather than breaks, that there's a pop sound? There is evidence. This is a little, there's evidence on both sides in that and the case below. Some of the experts have said what they heard was the rolling, and that's what would have sounded like a pop sound. What they heard was, and I'm going to use the wrong engineering word, I'm not sure, but essentially something breaking inside it once it starts to roll, that the concrete beam is put together with rebar and other things, and that once it starts to roll, there will be popping sounds inside. So, yes, there was evidence by the experts in the case during the initial discovery in the case below that talked about or explained what that pop sound could have been. Was Keeley aware of that? Yes. Yeah. When he destroyed the beam, he was aware that there was a pop sound? Oh, no, no, during the discovery is what I meant. Yeah, no, he was not aware at the time that he heard the pop sound. Now, in addition, in the discovery, it also came up that the plaintiff's claim was that the concrete was green, that it was not properly cured, and Keeley was not aware of that until the discovery, but moreover, even if Keeley had somehow heard that before the destruction, they knew that the Egyptian had done the inspection and that that had already been ruled out by Egyptians. Finally, and then I'll turn it over to Mr. Scott, appellants have argued in this case that Keeley voluntarily undertook to preserve this evidence, and I submit to the court he left it where it lay. He didn't undertake to segregate or to take his possession, this ivy. It fell. OSHA came out and looked at it where it lay. His people looked at it where it lay. I got looked at it where it lay. He must undertake voluntarily not to control it, but the law says to preserve it, and he didn't undertake that in this case. And so as a result, we would argue that Judge O'Malley was correct and that the first point of void was not met by the plaintiffs in this case and that there's no duty to protect them. With that, I will turn it over to Mr. Scott. Thank you. Thank you, Ms. Champion. Mr. Scott, you may take up your portion of the time. Thank you, Your Honor. Good morning. May it please the Court? Good morning. I am here and certainly not here because Ms. Champion hasn't done a great job. I am here as personal counsel for Keeley and Sons because as part of the history, the ten-year history of this case, this Court earlier decided that there is no insurance coverage for Mr. Keeley for this exfoliation claim. That decision was rendered in this Court, and the Supreme Court denied leave to appeal. So I am here as personal counsel, additional counsel, on behalf of Keeley and Sons. I was thinking this when I saw that the appellants had come up with not just one claim of a special circumstance but four claims of a special circumstance. And I remember my mentor, who was a member of this Court many years ago, used to tell me all the time that hard cases make bad law. And this is a hard case in the sense that we have three people who were badly injured in a claim. However, what has really occurred in this case is that a very intelligent and clever plaintiff's lawyer named Bruce Cook came up with a theory. And it's interesting that he didn't file this case. Again, you know, the initial case wasn't just filed against the products people and the designer and the manufacturer. And then all of a sudden he thought, well, maybe there's been exfoliation. He filed that at the same time. My memory serves me. It might have even originally been count one. And so he knew exactly what he was trying to do here, and he was trying to create this exfoliation claim. Now, I think it's also interesting that the manufacturer and the designer of the beam have filed their claims for exfoliation. And yet, Keeley's testimony and Keeley's position from the beginning in this case is that there was absolutely nothing wrong with this beam. Judge Spomer, you mentioned asking about a special circumstance. Well, think about this. This case might be different if Keeley had taken the position that they were supplied a defective beam by Egyptian or by Henderson. Then you may have a special circumstance. You may say, well, wait a minute. If that's going to be your claim, if your claim is that there's something wrong with this beam, then it seems almost reasonable that the beam be preserved in order to allow them to defend against it. We don't have that here. It's been Keeley's position from day one, literally day one, literally the day the accident happened and he found out about it, that what happened here was a group of heavy construction workers walked out on the end of an unsupported, untied beam over a creek. I mean, I noticed that Judge O'Malley used the word incredulous. If there's something incredulous in this case, it's that these guys all walked out like walking the plank. They all walked out on the end of this beam and the beam rolled. Other than a worker's comp claim, what other possible cause of action would a plaintiff utilize in this case? And that's the point. It took a very good lawyer to come up with some other claim and tie it to a spoliation claim. Well, but there's a product count there, too, is there not? Oh, there is now, sure. Mr. Cook came up with one. But the point being that what Keeley knew, Keeley knew there was a comp claim. There's no question about that. But the beam didn't matter. Should he have anticipated it? Hindsight's good, I guess. But to ask you the same question and ask opposing counsel, in this day and age, isn't it almost common knowledge that an injured person's going to look to try to circumvent the worker's comp law? Well, besides that, and maybe that's the case, we're confusing now, of course, foreseeability with duty. And I realize, again, the problem with the foreseeability being secondary, which is what Boyd says, is that it's hindsight. We're always looking at this in hindsight. But at the time, what Keeley had in front of him was a clear comp claim, that he had employees that were injured. Of course, whether there was fault involved on anybody's part made no difference. And again, I say, if Keeley at that moment had said, well, they sold me a crummy beam, there might be an argument that then he ought to have to prove it. He ought to have to preserve it and prove it. Keeley was faced with a couple of things. He was faced with the fact that he had injured employees, but he was also faced with an IDOT project that had to be kept on track. He was told by an Egyptian that if you give me these pieces out of that beam, I can get you a new beam faster. If I don't have these pieces, then I can't. It will take a lot longer to refabricate a beam. He's got IDOT, which says it rolled. He's got OSHA, which says it rolled. He's got IDOT, which says get it out of that creek. Clearly, he could have. He could have moved it. There's testimony in his deposition. It wouldn't have been easy. It was much more convenient and much more efficient to turn it into riprap, which stayed in the creek. If anybody wanted to test the concrete, of course, the concrete's still there. But what he was faced with was he had to get it out of the creek somehow. He also had to take it apart because he had these pieces that he had to resurrect. I don't see that there is any possible special circumstance here. In retrospect, fine. But I don't think at the time that he, with what he was faced with, that any special circumstance arises that would require him to preserve this. Thank you. Thank you, Mr. Scott. You have the opportunity for rebuttal, Mr. Gilbert. With all due deference to Mr. Cook, I wrote the appellate brief. A few things that were brought up by opposing counsel. Ms. Champion argues that the case law supports the proposition that the insurer-insured relationship is the type of special circumstance that the courts have found satisfy the relationship wrong. The Dardeen opinion reads, when we said in Boyd that a duty to preserve evidence could arise by an agreement or contract, we meant an agreement or contract between the parties to the spoliation claim. And they make that statement in response to Dardeen's novel argument that the insurance contract between Keeling, the insurer, and State Farm, the insurer, gave rise to special circumstances. I think that's important, not just for the sake of refuting opposing counsel's argument, because that lends credence to the argument that the contract between the insurer and the insured is not really what's at issue in these spoliation cases when the plaintiffs are trying to get the insurance company on the hook for the spoliation of the evidence. What's at issue is the amount of control that the insurance company exercises over the evidence. And that's directly in line with the plaintiff's argument, is that they had enough control to satisfy the relationship wrong, as analyzed in Dardeen and as analyzed in this court, by this court in Jones. And as analyzed in the Stennis case, which I didn't get a chance to speak about in my argument in chief, but the Stennis case was decided by this court as well. And in that case, this court decided that even if the employer spoliator had only preserved the evidence for purposes of preserving it for the regulatory agency and its obligations under the Federal Mine Safety and Health, Mine Health and Safety Act, that still is a voluntary undertaking. And that still is enough to get past the relationship problem. Let's not forget, we've got a whole other problem in this duty analysis that we've got to get into. I mean, even if this court finds that there was a special circumstance, plaintiffs still have the burden of showing that Keeley, in a sense, knew or should have known that this beam was material and relevant to potential litigation, or even potentially material and relevant to future litigation. So I think we should not focus too much on what Keeley knew or didn't know at this stage of the game. That's very important, yes. And I think there is enough evidence in the record to establish that Mr. Keeley or his employees knew or should have known that there was a potential for litigation. Shaw enough testified in his deposition that he would be guessing, but he would guess yes, there would be litigation arising out of this incident. I believe Ms. Champion made reference to the fact that they either didn't think there was anything wrong with the beam and there wasn't a concern. Their engineer has three pages of extremely complicated notes that I can't even pretend to understand, but that analyze essentially the rollover potential of this particular outfit. So I think it's difficult to believe that Keeley wasn't trying to figure out what happened. What effect, if any, is the fact that Keeley called Egyptian Concrete and Egyptian Concrete did nothing more than just say, cut off the ends and send those to us? Well, I think that's important here, Your Honor, and I think that goes to kind of the exchange that you had with the opposing counsel. Keeley and Sons has been in business for a long time. Keeley and Sons makes their money on construction contracts. And if Keeley can expedite this project and get this project done after a catastrophic loss, and they can do that by getting pieces to his beam fabricator, it's going to do that. And that makes sense. But that doesn't mean that it couldn't have crossed his mind that, hey, I might have got a bump beam here and I might be on the hook for a lot of money. What about Egyptian? It may cross their mind, too. Exactly. And they might have said, well, go ahead and get us the pieces. And, again, I don't want to imply any intent on anybody's part, and I don't want to be unfair to Mr. Westphalmer at all. It's possible. But I think that – I mean, Egyptian being a potential defendant here, Keeley thinks, well, I'm covered by workers' comp. All they want is the ends here. I'm giving them the ends. If they want to fight the battle later on with the plaintiffs, let them fight that battle. And I'm making my money on this contract and getting it done on time for IBOT. I'm not making my money on the lawsuit against Egyptian Concrete Company for a bad beam, because all they're going to get back is their comp lien anyway. So, yeah, I think the practicalities of the situation, Judge, are just that. And let's face it, I mean, it probably isn't the first time they did business with these particular entities, and it probably wasn't the last time they did business with these particular entities, and there's a business relationship there. And, you know, I don't want to get outside the record here, but, I mean, I think that's a reasonable inference from what we know about this case. That's all I have on this. Any further questions, please ask. Thank you all for your briefs and arguments. Thank you.